UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CHRISTY PETHERS, | Case No. 1:07-cv-605 |
| Plaintiff, | HONORABLE PAUL L. MALONEY |
| v. | Magistrate Judge Carmody |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**Order Sustaining Plaintiff's Objection as to Weight of Treating Physician's Opinion;
Declining to Adopt the R&R;
Reversing the Commissioner's Denial of Disability Insurance Benefits;
Remanding to the Commissioner for Payment of Benefits;
Terminating the Case**

Pursuant to 28 U.S.C. § 636 and this court's Local Civil Rules, this matter was automatically referred to the Honorable Ellen S. Carmody, United States Magistrate Judge, for a Report and Recommendation ("R&R").

Title 28 U.S.C. § 636(b)(1) provides, "Within ten days after being served with a copy [of an R&R], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court." Likewise, Federal Rule of Civil Procedure 72 provides that "[w]ithin 10 days after being served with a copy of the recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations." Magistrate Judge Carmody issued the R&R on August 7, 2008, and Pethers filed objections on

August 12, 2008.  Calculating the ten-day period as prescribed by Federal Rule of Civil Procedure 6(a), the court finds that Pethers' objections were timely.  The court also finds that plaintiff's objections are sufficiently specific and articulated to trigger *de novo* review of the portions of the R&R to which she has objected.[1]

The court finds the R&R to be thoughtful, but ultimately finds merit in one of the plaintiff's objections.  Specifically, as discussed below, the opinion of the treating physician should have been accorded controlling weight on this record, and the government's own vocational expert conceded that if the ALJ credited the treating physician's opinion, there would be no suitable jobs for Pethers subject to such limitations.

The R&R concluded that substantial evidence supported the ALJ's determination that Pethers' impairments – degenerative disease of the cervical spine, chronic obstructive pulmonary disorder ("COPD"), and borderline intellectual functioning, Tr 19 – indeed rendered her disabled, but not until April 24, 2006, which was after her date last insured ("DLI") of March 31, 2005.[2]  Prior to April 24, 2006, the ALJ found, Pethers had the residual functional capacity ("RFC") to perform a significant number of jobs, Tr 19-25.  Pethers continues to maintain that she has been disabled since October 1, 2000, and the court is compelled to agree based on the adequately-supported opinion of her treating physician, Dr. John Stevenson, M.D.

---

[1] By order issued August 29, 2008, this court directed the Commissioner to respond to Pethers' objections no later than Friday, September 26, 2008.  The Commissioner did not comply with the order, and did not seek an extension of time.

[2] The ALJ found that Pethers also suffered from the additional severe impairments of major depressive disorder and panic disorder without agoraphobia, but not until about January 2006, Tr 19, which was after her DLI.

Following an October 2000 back injury caused by lifting a propane tank, Pethers was diagnosed with acute lower muscular back spasm and participated in physical therapy ("PT") as instructed, but her back pain persisted, Tr 165, 167, 169, and an MRI[3] revealed a small to medium sized herniation to the right between the L5 (5th lumbar) and S1 (1st sacral) vertebrae, compressing the S1 root., Tr 209. Stevenson performed a laminectomy[4] and diskectomy of Pethers' L5-S1 on the right side on November 15, 2000, and she returned to PT in December 2000, Tr 170 & 173 & 185. Nonetheless, by January 5, 2001, Pethers reported that she could sit or stand for no more than 20 minutes at a time, Tr 184.

On January 16, 2001, Dr. Stevenson cleared Pethers to return to work, but only if the job adhered to these restrictions, which he characterized as *indefinite*: no bending or excessive twisting, lifting only up to 15 pounds and then only occasionally, no repetitive lifting, and changing positions frequently or as needed, Tr 202. By February 1, 2001, Pethers reported that her pain had not improved, and the PT noted "no bending or lifting", Tr 183. On February 20, Pethers' legs and

---

[3]MRI stands for magnetic resonance imaging, which is

> a nonionizing (non-x-ray) technique using magnetic fields and radio frequency waves to visualize anatomic structures. It is useful in detecting joint, tendon, and vertebral disorders. The patient is positioned within a magnetic field as radio wave signals are conducted through the selected body part. Energy is absorbed by tissues and then released.

STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006) ("STEDMAN'S") at B13. A computer processes the energy released and formulates an image. *Id.*

[4] A laminectomy is the excision of a vertebral lamina (plate). *See* STEDMAN'S at 1043 (lamina) and 1044 (laminectomy). A discectomy, also known as a discotomy, is the excision of an inter-vertebral disc. *See* STEDMAN'S at 550.

3

lower back were still painful enough to require periodic use of Vicodin[5], Tr 206, a combination of Acetaminophen and the narcotic Hydrocodone which is used to treat moderate to moderately severe pain. After another MRI, Dr. Stevenson opined in February 2001 that Pethers was able to return to work, but subject to those same substantial indefinite restrictions, Tr 188-89 & 201.

A March 2001 MRI revealed spinal canal stenosis, i.e., narrowing of the spinal canal,[6] at C6-7 (the 6th and 7th cervical vertebrae) and stenosis to a lesser extent at C5-6, but no evidence of "abnormal signal" in the spinal cord, Tr 188. Pethers complained of lower back pain that radiated into her right leg, and an examination by Dr. Pullum later that same month revealed spasm and tenderness in the right lumbar area, positive straight-leg-raising and Patrick's Test[7] on the right side, and decreased motor and sensory function on the right side. Tr 195-96. Dr. Pullum diagnosed

---

[5]

*Hendrixson v. BASF Const. Chems., LLC*, – F. Supp.2d –, –, 2008 WL 3915156, *12 n.13 (W.D. Mich. Aug. 20, 2008) (Maloney, C.J.); *Lester v. Astrue*, 2008 WL 4371492, *4 n.10 (E.D. Mo. Sept. 19, 2008) (citing http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html).

[6]STEDMAN'S at 1832 (stenosis).

[7]
Named after American neurologist Hugh T. Patrick (1860-1938), this test determines the presence of sacroiliac disease, i.e., disease of the sacrum (the vertebrae that form part of the pelvis) and the ilius (the broad, flaring portion of the hip bone). STEDMAN'S at 947 (ilium), 1443 (Patrick), 1714 (sacrum), 1958 (Patrick's Test).

The patient is supine (lying down with face upward). *Id.* at 1958 (Patrick's Test). The hip and knee are flexed, and the external malleolus (a rounded bony prominence at the lateral side of the lower end of the fibula (the smaller, non-weight-bearing bone of the leg)) is placed above the patella (kneecap) of the opposite leg. *Id.* at 727 (fibula), 1147 (malleolus), 1441 (patella), 1714 (sacroiliac), 1871 (supine), 1958 (Patrick's Test). This can ordinarily be done without pain, but a person with sacroiliac disease will promptly feel pain when the knee is depressed. *Id.* at 1958 (Patrick's Test).

lumbar radiculitis, i.e., inflammation of the spinal nerve root in the lower back,[8] and recommended a series of epidural steroid injections,[9] which Pethers began that day.  Tr 196-97.

In April 2001, Pullum again examined and administered a cervical steroid injection to Pethers, who reported no benefit from the March 2001 injection and complained that her neck pain (8-9 on a scale of 1 best to 10 worst) was worse than her back pain.  Tr 193-94.  Pethers received two more cervical steroid injections in April 2001 and rated her neck pain as a 7 out of 10.  Tr 191-92.

A September 2001 exam by Dr. Stevenson revealed stable deep tendon reflexes, normal balance and gait, and no evidence of focal weakness, tenderness, impingement or peripheral entrapment[10], but Pethers reported continued pain, especially in her neck and left upper extremity, Tr 204.  Later that month, Pethers underwent cervical decompression and fusion surgery at C5-C6 and C6-7, Tr 213.

A March 2002 exam by Stevenson revealed negative straight leg raising and mild tenderness in the myofascia (the sheets of fibrous tissue that surround and separate muscle tissue)[11], and Pethers reported that her neck and arm were feeling "well" but that she still had lower back pain.  Tr 200.

---

[8]STEDMAN'S at 1621 (radicula) and 1622 (radiculitis).

[9]Epidural means on or immediately outside the dura mater, which is the tough, fibrous membrane that forms the outer covering of the central nervous system.  STEDMAN'S at 654 (epidural) and 592 (dura mater).

[10]
Carpal tunnel syndrome is an example of peripheral nerve entrapment.  *See* the website of the University of Michigan Health System's Taubman Health Care Center, http://www2.med.umich.edu/healthcenters/clinic_detail.cfm?service_id=1131, retrieved on September 29, 2008.

[11]STEDMAN'S at 1272 (myofascial) and 700 (fascia).

A February 2003 exam by a Dr. Benzing revealed a normal active range of motion ("ROM") of the neck with no tenderness to firm palpation (touch)[12], mild tenderness in the upper extremities with good ROM, no tenderness in the back, relatively well-aligned vertebrae in the cervical spine (per X-ray), unremarkable neurological function, and mild to moderate tenderness in the left hip but no other abnormality in the hips.  Tr 259-61.

At a May 2004 exam, Pethers reported back and neck pain, and a Dr. Lazzara discerned mild difficulty getting on and off the exam table, moderate difficult with heel-to-toe walking, and moderate difficulty squatting and hopping, all of which tended to exacerbate Pethers' back pain. Tr 228-29.  Pethers had positive straight-leg-raising and diminished ROM in the cervical and dorsolumbar spine, and Lazzara diagnosed chronic neck and back pain.  Tr 229-30.  A June 2004 RFC assessment by non-treating physician Dr. John Pai, M.D., found that Pethers could lift ten pounds frequently or 20 pounds occasionally, could not do more than occasional overhead lifting, and could sit or stand six hours out of eight, Tr 249 & 251.

In May 2005, Pethers went to the emergency room, reporting an "always present . . . dull ache" in the lumbar spine that had worsened in the past few days, Tr 263-65.  At that time, X-rays and MRI revealed no evidence of disc herniation (abnormal protrusion)[13] or significant "mass effect" at L5-S1, but did reveal post-surgical degenerative changes at the lumbo-sacral junction and minimal early degenerative change at L4-5.  Tr 266-68.

At an April 2006 exam, Pethers complained of "constant" neck and back pain radiating down her left upper extremity, rating her pain as a 9 out of 10 and worsening in the past 30 days, and a Dr.

---

[12]STEDMAN'S at 1408.

[13]STEDMAN'S at 881 (herniation).

Schmuggerow discerned that she seemed to be experiencing moderate discomfort, lack of movement in the neck during conversation, neck tenderness upon palpation, and an "extremely limited " ROM in her back, Tr 309 & 311-12.

The R&R acknowledged that treating physician Stevenson expressly opined, in January 2001, that Pethers was indefinitely restricted to lifting no more than 15 pounds occasionally, Tr 202, but concluded that the ALJ properly declined to accord controlling weight to that opinion, finding instead that Pethers retained the ability to lift or carry 20 pounds occasionally and 10 pounds frequently. *See* R&R at 11. This court agrees with Pethers that on this record, the ALJ should have deferred to the treating physician's statement of more-onerous indefinite restrictions.

Generally, treating physicians' opinions "'are given substantial, if not controlling deference.'" *Deihl v. SSA*, 2008 WL 408463, *4 (W.D. Mich. Feb. 12, 2008) (Maloney, J.) (quoting *Vance v. SSA*, 260 F. App'x 801, 804 (6th Cir. 2008) (McKeague, J.) (quoting *Warner v. SSA*, 375 F.3d 387, 390 (6th Cir. 2004)); *see also Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006) (Richard Allen Griffin, J.) (referring to "the mandatory deference accorded to treating physicians in Social Security cases"). Indeed, if a treating physician's opinion is uncontradicted, it is entitled to complete deference. *Deihl*, 2008 WL 408462 at *4 (citing *Howard v. SSA*, 276 F.3d 235, 240 (6th Cir. 2002) (citing *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)).[14] Indeed, a regulation that binds the Commissioner promises claimants,

If we find that a treating source's opinion on the issue(s) of the nature and severity

---

[14] *See, e.g., Martin v. SSA*, 61 F. App'x 191, 199-201 (6th Cir.) (opinions of treating psychiatrist and treating psychologist were entitled to complete deference where they were not contradicted by any expert medical opinion; ALJ erred by rejecting treating sources' interpretation of claimant's Global Assessment of Functioning ("GAF") scores in favor of ALJ's own interpretation of the GAF scores and daily-activity logs), *clarified on other grounds*, 82 F.3d 453 (6th Cir. 2003).

>of your impairment(s) is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2).

>The rationale for the treating-physician rule is that

>these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).

A treating physician's opinion is entitled to deference, however, only when supported by "objective medical evidence," *Deihl*, 2008 WL 408462 at *5 (citing *Vance*, 260 F. App'x at 804 (quoting *Warner*, 375 F.3d at 390)), and it may be rejected in whole or in part when it contradicts substantial objective medical evidence in the record, *Deihl*, 2008 WL 408462 at *5. Moreover, the *legal* determination of disability is ultimately the prerogative of the Commissioner, not the treating physician. *Vance*, 260 F. App'x at 804 (quoting *Warner*, 375 F.3d at 390); *see also* 20 C.F.R. § 404.1527(e)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability."); 20 C.F.R. § 404.1527(e)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2) of this section.").

When the agency does not give controlling weight to a treating physician's opinion, it determines the weight to be accorded the opinion by applying the factors listed in 20 C.F.R. § 404.1527(d)(2)(I)) and (d)(2)(ii) – length of treatment relationship, frequency of examination, and the nature and extent of the treatment relationship – as well as the factors in 20 C.F.R. §

404.1527(d)(3) through (d)(6) – supportability by medical evidence, especially laboratory findings and medical signs, consistency with the record as a whole, the treating physician's specialization in a relevant field of practice, and other factors. *See* 20 C.F.R. § 404.1527(d)(2).

Whenever the Commissioner elects not to give controlling weight to the treating physician's opinion, the regulation obligates the Commissioner "always give good reasons in [the] notice of determination or decision for the weight" given to the treating source's opinion. *See* 20 C.F.R. § 404.1527(d)(2). Our Circuit holds that the agency's failure to comply with this requirement is generally not subject to harmless-error analysis. *Bradford v. SSA*, 2008 WL 398281, *3 (W.D. Mich. Feb. 11, 2008) (Maloney, J.) (citing *Wilson*, 378 F.3d at 547).[15]

There is no doubt that Dr. Stevenson qualifies as a treating physician based on the nature and

---

[15]

There is an exception to this rule: "'a narrow category of cases . . . in which a *de minimis* procedural violation may constitute harmless error, such as when 'a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it' or where the Commissioner 'has met the goal of . . . the procedural safeguard of reasons.'" *Bradford*, 2008 WL 398281 at *3 n.2 (quoting *Fisk v. Astrue*, d F. App'x - (6th Cir. 2007) (Sutton, J.) (quoting *Wilson*, 378 F.3d at 547)).

This exception to the statement-of-good-reasons requirement does not apply, because Dr. Stevenson's opinion about Pethers' limitations was not "so patently deficient that the Commissioner could not credit it" and the Commissioner did not meet the goal of this procedural requirement.

There is a second exception to the rule that harmless-error analysis does not apply when the Commissioner fails to supply good reasons for declining to give controlling weight to the treating physician's opinion. Such "'error is harmless where the Commissioner adopts the opinion of the treating source or makes only findings that are consistent with the opinion.'" *Bradford*, 2008 WL 398281 at *3 (quoting *Heston v. SSA*, 245 F.3d 528, 535-36 (6th Cir. 2001) and *Pasco v. SSA*, 137 F. App'x 828, 840 (6th Cir. 2005) (citing the dicta of *Wilson*, 378 F.3d at 547, to that effect)).

This exception does not apply here, either, because the agency did not adopt Stevenson's opinion, instead making a finding inconsistent with his opinion. Specifically, while Stevenson opined that Pethers was indefinitely restricted to lifting no more than 15 pounds occasionally, Tr 202, the ALJ found instead that Pethers retained the ability to lift or carry 20 pounds occasionally and 10 pounds frequently through April 23, 2006, after her DLI. *See* R&R at 11.

length of his medical relationship with Pethers in connection with this injury and its physical consequences.[16]

The court also finds that Stevenson's statements about Pethers' physical limitations constitute expert medical opinion as defined by the regulations and case law.  Dr. Stevenson did not merely list or summarize data from physical tests or laboratory tests, but rendered his expert opinion, based on his own surgery on Pethers, his repeated examinations of Pethers and her MRIs, X-rays and other results, that she was indefinitely incapable of doing any job that entailed more lifting or other exertion than that described.  *Contrast Ackermann-Papp v. SSA*, 2008 WL 314682, *2 (W.D. Mich. Feb. 4, 2008) (Maloney, J.) ("[N]o treating source actually rendered a medical 'opinion' – properly understood – about Ackermann-Papp's ability to perform basic work activities during the relevant period, as a Global Assessment of Functioning ('GAF') score alone does not constitute a medical opinion.") (citing 20 C.F.R. § 404.1527(a)(2) and 20 C.F.R. § 416.927(a)(2) (defining

---

[16]

In our Circuit, as a matter of law, more than one examination is required to attain treating-physician status. *Kornecky v. SSA*, 167 F. App'x 496, 506 (6th Cir. 2006) (p.c.) (Siler, Richard Allen Griffin, D.J. Katz) ("A plethora of decisions unanimously hold that a single visit does not constitute a treating relationship.") (citing *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005)).  Indeed, "depending on the circumstances and nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship." *Kornecky*, 167 F. App'x at 506 (citing *Cunningham v. Shalala*, 880 F. Supp.2d 537, 551 (N.D. Ill. 1995) (where physician saw claimant five times in two years, it was "hardly a foregone conclusion" that his opinion should be afforded great weight)). *See, e.g., Luteyn v. SSA*, 528 F. Supp.2d 729, 733 (W.D. Mich. 2007) (Paul L. Maloney, J.) (physician was merely an examining physician, not a treating physician, because he had not examined plaintiff on a sufficient number of occasions and with sufficient frequency).

The record here shows that Dr. Stevenson examined Pethers numerous times over an extended period specifically in connection with her neck/back impairments, including an examination after the injury in October 2000, surgery in November 2000, and examinations at least in January 2001, February 2001, September 2001, and March 2002, and continuing.  That is not the kind of isolated, sporadic, or short-term doctor-patient relationship that has led federal courts to deny a claim of treating-physician status.

"medical opinions" as "statements from physicians . . . that reflects judgments about the nature and severity of [plaintiff]'s impairments, including [plaintiff]'s symptoms, diagnosis, and prognosis, what [plaintiff] can still do despite impairment(s), and [plaintiff]'s physical or mental restrictions.")).

The R&R states that while Stevenson's lifting limitation (no more than 15 pounds occasionally)

> may have been appropriate for a limited period of time, as the ALJ observed, the medical evidence does not support the indefinite imposition of such a limitation. Neither the treatment notes of any of Plaintiff's care providers nor the results of objective medical tests support such a limitation. Instead the medical evidence reveals that Plaintiff's back surgery (and subsequent neck surgery) were successful. Numerous examinations and objective tests conducted following these surgeries revealed minimal findings which fail to support Dr. Stevenson's opinion. In sum, there exists substantial evidence to support the ALJ's decision to accord less than controlling weight to Dr. Stevenson's opinion.

R&R at 12. But the Commissioner has not shown that Dr. Stevenson acted without support from "medically acceptable clinical or diagnostic techniques" in stating that the physical limitation could be expected to continue indefinitely. And the Commissioner has not shown what evidence justified the ALJ in asserting, contrary to the treating physician's diagnosis of "indefinite" limitations, Pethers' limitations nonetheless should be treated as resolving themselves in less than 12 months. As for the fact that the treatment notes themselves do not expressly state the indefinite limitations, the regulation requires only that the treating physician's opinion be "well-supported by acceptable clinical and laboratory diagnostic techniques", 20 C.F.R. § 404.1527(d)(2), not that his treatment notes in particular state *his ultimate conclusion* (elsewhere expressed) as to the nature, extent, and duration of his patient's physical limitations.

With regard to the next part of the R&R's rationale, whether or not Pethers' back and neck surgeries could be considered "successful" by some measure, the fact remains that *after* the

11

November 15, 2000 back surgery – laminectomy and diskectomy to resolve herniation at the L5-S1 vertebrae – Pethers still experienced substantial pain. And Dr. Stevenson did not merely rely on Pethers' subjective claims of pain, which might be a problem for Pethers given the ALJ's finding that she was not entirely credible as to her pain prior to April 23, 2006.[17] Rather, Dr. Stevenson's opinion about Pethers' limitations was supported by objective evidence such as the persistence of muscle spasm in the right lumbar area, a finding of decreased motor and sensory function on the right side, and a diagnostic test ("Patrick's Test") indicating the presence of sacroiliac disease, upon examination by Dr. Pullum in March 2001, *see* Tr 195-96. That was about four months *after* the back surgery. The Commissioner has not shown that the means used by Dr. Stevenson or Dr. Pullum to generate those results and findings were not "medically acceptable clinical or diagnostic techniques."

Likewise, to the extent that Dr. Stevenson's limitation opinion was based on Pethers' *neck* condition rather than only her *back* condition, there is objective medical evidence to support his opinion on this score as well. Pethers points to a post-neck-surgery MRI that showed foraminal

---

17

*Contrast Turner v. SSA*, 257 F. App'x 456 (6th Cir. 2008) (ALJ did not err in rejecting treating physician Kelly's opinion):

> The ALJ found Dr. Watson's opinion to be more consistent with the clinical evidence. In Dr. Watson's opinion, the clinical findings that one would expect to find in a person with the conditions diagnosed by Dr. Kelly were not present. Dr. Watson specifically indicated that to support Dr. Kelly's diagnosis one would expect radiculopathy, structural problems, or a greater loss of range-of-motion. *The ALJ concluded that Drs. Engel and Kelly's diagnoses were "almost entirely" based on Turner's subjective reports.* The ALJ also noted that she did not find Turner's subjective reports "entirely credible."

*Id.* at 460 (emphasis added).

narrowing,[18] Tr 205, and there is no suggestion that the MRI was not properly administered or interpreted or was otherwise not a "medically acceptable clinical or diagnostic technique." Then, as much as two years and eight months *after* Pethers' September 2001 *neck* surgery – cervical decompression and fusion surgery at the C5-C6 and C6-C7 vertebrae, Tr 213 – Pethers still had verifiable straightening and reduced ROM of the cervical and lumbar spine in May *2004*, *see* Pethers Objection at 9 (citing Tr 230). The Commissioner has not shown that those findings were not based on "medically acceptable clinical or diagnostic techniques."

Moreover, while there are numerous types of deficiencies in supporting medical evidence that might justify an ALJ refusing to give controlling weight to a treating physician's opinion, the Commissioner has not shown that such deficiencies here. For example, there is no suggestion that Stevenson examined and treated Pethers primarily in connection with conditions other than those covered by his limitation opinion, such that the "medically acceptable clinical or diagnostic techniques" he relied on pertained to some other limitations. *Contrast Vance*, 260 F. App'x at 805 (although treating physician Poore diagnosed fibromyalgia, he "appeared to treat [the claimant] mostly for sinusitis and bronchitis, rather mild pulmonary problems", and while treating physician "Goldfarb stated that Vance's biggest problem was fibromyalgia, he tested Vance only once for fibromyalgia in 2001 . . . .").

Nor is this a case where Dr. Stevenson's opinion was actually *contradicted* by his own treatment notes (or the treatment notes of another treating physician). *Contrast Gaskin v. SSA*, 284 F. App'x 472, 474-75 (6th Cir. 2008) (Daughtrey, Clay, McKeague) (no error in ALJ's refusal to

---

[18]A foramen is "an aperture or perforation through a bone or a membranous structure." STEDMAN'S at 756.

defer to treating physician Brown's opinion where, *inter alia*, treating physician's "*own notes*, as well as the report of . . . a neurologist to whom Dr. Brown referred Gaskin, indicated that Gaskin had normal neurological function.") (emphasis added).

Nor has the Commissioner shown that Dr. Stevenson based his opinion on a simply inaccurate reading of objective medical evidence that Stevenson cited as a basis for that opinion. *Contrast Sanders v. SSA*, 66 F. App'x 551, 553 (6th Cir. 2003) (p.c.) (Guy, Boggs, Daughtrey) (ALJ did not err in disregarding treating physician Sexton's opinion, because "Sexton's opinion was based on his belief that Sanders had a 'very large herniated disc in the lumbar region.' However, an MRI revealed only 'a small . . . herniation . . . [which] slightly displaces the right S1 nerve root.'").

Nor is treating physician Stevenson's opinion inconsistent with Pethers' reported or observed physical activities during the insured period. *Contrast Turner v. SSA*, 257 F. App'x 456, 460 (6th Cir. 2008) (ALJ did not err in rejecting treating physician's opinion where, *inter alia*, the work restrictions he recommended were inconsistent with claimant's own testimony about his ability to engage in physical activity).

Nor was Dr. Stevenson's opinion based on stale, outdated evidence that arguably could not constitute objective evidence probative of Pethers' limitations during the insured period. *Contrast Anthony v. Astrue*, 266 F. App'x 451, 459 (6th Cir. 2008) (Guy, Gilman, McKeague) (ALJ did not err in rejecting treating physician's opinion where, *inter alia*, "[t]he determination by [the treating physician] that Anthony was totally disabled was made in June of 2004. But the last time that Anthony had seen [the treating physician] prior to June of 2004 was in 1998. There is no evidence that Dr. Pecar treated Anthony between 1999 and 2002. \* \* \* The ALJ relied on the VA hospital reports between 1999 [and] 2002, which consistently state that Anthony had not had a serious

14

seizure since 1997 . . . ."); *Hamblin v. Apfel*, 7 F. App'x 449, 451 (6th Cir. 2001) (ALJ was entitled to conclude that back pain was not disabling during the relevant period, notwithstanding treating physician's contrary opinion, because treating physician's report was five years old and claimant himself stated that his condition had improved materially since then).

Finally, as mentioned above, the treating-physician regulation did not permit the ALJ to give less than controlling weight to Dr. Stevenson's opinion about Pethers' limitations unless it was inconsistent with other substantial medical evidence of record. *See* 20 C.F.R. § 404.1527(d)(2). Significantly, as Pethers notes, the only medical experts who opined that Pethers could lift more than the occasional fifteen pounds determined by Dr. Stevenson were an expert who examined her only *once*, and an expert who merely reviewed her records and *never* examined her. *See generally Jones v. SSA*, 336 F.3d 469, 477 (6th Cir. 2003) (opinion of a non-treating physician is entitled to "if any[ deference], less deference than the treating physician's opinion"); *see, e.g., Walker v. HHS*, 980 F.2d 1066, 1071-72 (6th Cir. 1992) (physician who merely reviewed claimant's records); *Runyon v. Apfel*, 100 F. Supp.2d 447 (E.D. Mich. 1999) (physician who examined claimant only once).

In sum, the evidence of record need not *compel* every competent, rational treating physician to reach the same conclusion that Dr. Stevenson did. In other words, the standard for deference to a treating physician's opinion is not whether another treating physician reasonably could have reached a different conclusion about the severity and duration of Pethers' limitations. The only treating physician in the case is Dr. Stevenson,[19] "medically acceptable clinical or diagnostic

---

[19]

*Contrast Cruse v. SSA*, 502 F.3d 532 (6th Cir. 2007) (ALJ was not required to give controlling weight to one treating physician's opinion that claimant could not work due to inability to stand or walk, dizziness, dissociative episodes, depression, anxiety, and panic, over the contrary opinions, some more recent, of *other treating physicians*); *Martin v. SSA*, 170 F. App'x 369 (6th Cir. 2006).

15

techniques" and resultant objective medical evidence exists to support his opinion, and there was not *substantial* (rather than merely *some*) objective medical evidence to the contrary. That is sufficient to entitle his opinion to controlling weight.

Accordingly, Dr. Stevenson's opinion is dispositive of Pethers' ability to work: the Commissioner's vocational expert himself conceded that if he incorporated Stevenson's assessment of Pethers' limitations, there would be no jobs that Pethers could do. *See* Pethers Objections at 13 (citing Tr 351-52).

Therefore, the court determines that remand would be futile. The Commissioner has not presented legal authority for the proposition that the Commissioner must be afforded an opportunity to see whether a second vocational expert would contradict the first VE's opinion that Pethers' RFC (subject to Stevenson's limitations) rendered her disabled during the insured period. As a sister court stated in a similar circumstance,

> Dr. Seigel, the SSA's vocational expert, conceded that if the ALJ accepted the treating physicians' opinions, Gang would be unable to perform her past work and, for step five, the other sedentary jobs he had identified. Because application of the correct legal standard inexorably leads to the conclusion that Gang is disabled, remand for calculation of benefits . . . is appropriate.

*Gang v. Barnhart*, 2003 WL 22183423, *6 (E.D.N.Y. Sept. 23, 2003). *See also Gallant v. Heckler*, 753 F.2d 1450, 1456, 1457 (9th Cir. 1984) ("[T]he vocational expert admitted that if claimant in fact suffered from constant, severe pain, it would preclude him from all work activity. Because neither the hypothetical nor the answer properly set forth all of Gallant's impairments, the vocational expert's testimony cannot constitute substantial evidence to support the ALJ's findings. * * * Because we find substantial evidence in the record as a whole . . . that Gallant is disabled . . . , we need not remand the case to the ALJ for further proceedings."); *Podedworny v. Harris*, 745 F.2d 210,

224 (3d Cir. 1984) (Arlin Adams, J., concurring) ("Undisputed evidence in the record demonstrates that the ALJ's second hypothetical question . . . rested on a proper factual basis.  In response to that inquiry the government's vocational expert conceded that the claimant could not do sedentary work.  Thus . . . a remand on the central issue would serve no purpose."); *Greathouse v. Sullivan*, 1990 WL 212102, *10-11 (W.D. Mo. Nov. 28, 1990).[20]

Plaintiff further objects that the ALJ erred in finding that her complaints about the level of pain were not entirely credible for the period prior to April 24, 2006.  *See* Objections at 13-17 and R&R at 13-15.  Because the ALJ's error with regard to the weight of the treating physician's opinion is alone sufficient to require reversal of the agency's decision and remand for payment of benefits, the court need not evaluate whether the ALJ also erred in his assessment of Pethers' credibility.

## ORDER

Accordingly, having reviewed the complaint, the parties' briefs, the R&R, and plaintiff's objections to the R&R, and having received no response from the Commissioner to the objections, the court hereby **SUSTAINS in part and DISMISSES in part without prejudice** the plaintiff's objections [document #10].

Plaintiff's objection regarding the weight that the ALJ accorded treating physician Dr. Stevenson's opinion is **SUSTAINED**.

Plaintiff's objection regarding the ALJ's assessment of her credibility is **DISMISSED**

---

[20]

*Cf. Estes v. Harris*, 512 F. Supp. 1106, 1116 (S.D. Ohio 1981) ("as the Secretary has already presented vocational testimony regarding light and sedentary work, a remand for further evidence . . . would be a futile exercise"); *Lachey v. HHS*, 508 F. Supp. 726 (S.D. Ohio 1981) ("[A] remand for additional vocational testimony would be a fruitless and futile exercise.").

17

**WITHOUT PREJUDICE AS MOOT.**

The court **DECLINES TO ADOPT** the R&R [document #9].

The decision of the Commissioner of Social Security is **REVERSED.**

This matter is **REMANDED to the Commissioner for payment of benefits** for the period from the plaintiff's alleged disability onset date through her date last insured.

This is a final order.[21]

**IT IS SO ORDERED this 1st day of October, 2008.**

/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge

---

[21] Because the Commissioner disregarded this court's order to file a response to the plaintiff's objections by September 26, 2008, the Commissioner may have waived or forfeited his right to appeal this court's decision. However, this court will leave such a determination to our Court of Appeals in the event that the Commissioner attempts to appeal.